

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel.<br>KEVIN BULLOCK and CHARLES PATRICK,<br><br>    Plaintiffs,<br><br>v.<br><br>SALLYPORT GLOBAL HOLDINGS INC., and<br>IAP WORLDWIDE SERVICES, INC.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 2 1 9 C V 2 4 5 7<br><br>JUDGE: Judge Sargus<br><br>COMPLAINT<br>FILED UNDER SEAL<br>PURSUANT TO 31 U.S.C.<br>§3730(b)(2)<br><br>JURY TRIAL DEMANDED<br><br>MAGISTRATE JUDGE DEAVERS |

Relators, Kevin Bullock and Charles Patrick ("Relators"), bring this Complaint on behalf of the United States of America (United States or Government), against defendants Sallyport Global Holdings Inc. ("Sallyport") and IAP Worldwide Services, Inc. ("IAP) (collectively, "Defendants") to recover monetary damages and civil penalties arising from false claims, statements, and records that Defendants knowingly submitted or caused to be submitted to agencies of the United States in violation of the False Claims Act, 31 U.S.C. §§ 3729–3733 (FCA).

In 2014, Sallyport was awarded a multi-year Government contract to provide facility and security services at Balad Air Base in Iraq. The Contract provides support to the Iraqi F-16 program. Sallyport was required to provide, maintain, and staff an air traffic control system for aircraft operating from or around Balad Air Base. It has failed to do so and with full knowledge of its failures, it has misled the United States into believing it is in compliance with the 2014 Contract's requirements.

As described below, Sallyport and its subcontractor, IAP, have failed to properly install and maintain Balad Air Base's navigational systems. Such failures have prevented Sallyport from providing any effective RAPCON services, which services are an essential component of the 2014

Contract. The 2014 Contract provides support to the Iraqi F-16 program. Without these functions, the program faces serious risks. Despite knowing that the Radar system was ineffective and therefore RAPCON services could not be provided, Sallyport staffed RAPCON controllers beginning in June 2016, yet Sallyport did not start providing any RAPCON services until October 2018. Sallyport continued to staff RAPCON controllers after October 1, 2018 and soon realized the services could not be properly provided according to the Contract's requirements. The effect of these failures was to leave an important military air base without an effective air traffic control system, thus endangering lives and the security of the surrounding area.

Sallyport's actions are far more than a breach of its contract with the USA. Sallyport perpetuated a fraudulent scheme that included falsifying records to obscure its failures and made deliberate misrepresentations to government contracting officials. Sallyport's supervisors had actual knowledge of their contractual failures yet failed to disclose those failures to the USA and misrepresented their performance to the USA all the while Sallyport continued invoicing the USA for its services and continues to do so.

## PARTIES

1. The plaintiff in this action is the United States of America. The Government agencies harmed by Defendants' conduct include, among others, the Department of Defense and the Department of the Air Force.

2. The Relators in this action are Kevin Bullock and Charles Patrick. Mr. Bullock is an employee of Sallyport stationed at Balad Air Base and currently serves as RAPCON Chief. Mr. Patrick is a former IAP employee who was also stationed at Balad Air Base. Mr. Patrick formerly worked on the Radar system at Balad Air Base for IAP Worldwide Services.

3. Defendant Sallyport Global Holdings, Inc. is headquartered at 11921 Freedom Drive, Suite 1000, Reston, VA 20190. It was founded in 2003 and, according to its website, "specializes in operations within complex environments providing expertise in life and logistics support, base operations and maintenance, security and risk management, and construction."[1] Sallyport currently staffs Balad Air Force in Iraq as a result of its contract with the United States of America. Sallyport's main job is to sustain the Iraqi Air Force's F-16 fighter jet program.

4. Sallyport was formerly owned by Michael Baker International, LLC. It is currently owned by Caliburn International Corporation, a Delaware Corporation. Its headquarters are located 10701 Parkridge Boulevard, Suite 200, Reston, Virginia 20191.

5. Defendant IAP Worldwide Services, Inc. ("IAP") is a Delaware corporation headquartered at 7315 N. Atlantic Ave., Cape Canaveral, FL 32920. According to the company, it provides global logistical support to the U.S. armed forces and also specializes in aviation engineering solutions. IAP Worldwide Services is a subcontractor to Defendant Sallyport and provides various air traffic control services for Sallyport at Balad Air Base.

6. According to information obtained from the U.S. Department of Justice, IAP was the subject of a Non-Prosecution Agreement in 2015 for purported violations of the Foreign Corrupt Practices Act. Under the settlement, IAP agreed to extended supervision through May 2018.[2]

---

[1] https://www.sallyportglobal.com/about/ (last accessed: April 18, 2019.)
[2] https://www.justice.gov/opa/file/478281/download

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), the latter of which specifically confers jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

8. This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process, and Defendants have the requisite contacts with the United States.

9. Venue is proper in this District under 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) because Defendants transacted business in, or at least one of the acts proscribed by 31 U.S.C. § 3729 was committed in this District.

10. Relators have standing to bring this action pursuant to 31 U.S.C. § 3730(b)(1).

## THE FALSE CLAIMS ACT

11. The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (a) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (b) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

12. The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

13. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded ..." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

14. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

15. Private citizens, such as Relators, can bring actions on the government's behalf. "A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C. § 3730(b)(1).

16. There has been no public disclosure under 31 U.S.C. § 3730(e) of the allegations or transactions in this Complaint with respect to which Relators are not an "original source," and all material information relevant to this Complaint was provided to the United States Government prior to filing this Complaint as required by 31 U.S.C. § 3730(e)(4)(B). Relators have direct and independent knowledge of the information on which the allegations are based. To the extent that any allegations herein have been "publicly disclosed," Relators have knowledge that is independent of and materially adds to such publicly disclosed allegations.

## BACKGROUND

### A. GOVERNMENT CONTRACTS

17. There are various types of government contracts. This case involves both fixed-price and cost-plus contracts.

18. Fixed-price contracts generally provide for a price that is not dependent on the costs incurred by contractors during performance, although some fixed-price contracts allow for price adjustments based on cost performance in relation to a target cost agreed on by the parties. Subpart 16.2 of the Federal Acquisition Regulation (FAR) recognizes five types of fixed-price contracts: (1) firm fixed-price; (2) fixed-price with economic price adjustment; (3) fixed-price with price redetermination (both prospective and retroactive); (4) fixed-price level-of-effort; and (5) fixed-price incentive. Focusing on firm fixed-price contracts, the FAR states that "[a] firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." 48 C.F.R. § 16.202-1 (2012). "This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss." *Id.*

19. Under fixed-price contracts, the government agrees to pay a certain price for a product or service at the time of award. The contractor: 1) bears the risk of excess performance costs; and 2) has the greatest profit opportunity if the contractor can manage or reduce the costs of performance. As described below, Sallyport profited by reducing its costs such that it was unable to properly perform its contractual obligations.

20. Compensation under a fixed-price contract is comprised of one primary component: payment of a negotiated overall contract price. Payment for indirect costs is embedded into that overall price, which is negotiated based on the prevailing Billing Rate. *See id.*

(provisional Billing Rates and final overhead rates "shall be used . . . in determining progress payments under fixed-price contracts."). See FAR § 42.703-1(b).

21. A cost-plus-fixed-fee contract "is a cost-reimbursement contract that provides for payment to the contractor of a negotiated fee that is fixed at the inception of the contract. The fixed fee does not vary with actual cost but may be adjusted as a result of changes in the work to be performed under the contract." 48 CFR § 16.306.

22. Compensation under a cost-plus contract is comprised of three primary components: reimbursement of direct costs, reimbursement of indirect costs according to an overhead rate, and payment of a fee.

23. A "cost-plus" contract is a contract in which the federal government agrees to pay the contractor for the costs incurred in the contractor's performance of the work. The contractor is then paid its fee in addition to the costs of performance, and the fee can be calculated in one of several different ways.

24. As defined by the Federal Acquisition Regulation (FAR), Title 48 of the Code of Federal Regulations, "direct costs" are those directly attributable to a specific "cost objective," FAR § 2.101—a specific "function, organizational subdivision, contract or other work unit." FAR § 31.001. Direct costs may include the salary of laborers working on a project covered by a specific contract and the cost of materials needed for that project.

25. "Indirect costs" are those not directly attributable to a specific cost objective because they are incurred in support of two or more cost objectives, or in support of the operation of the business as a whole. FAR § 2.101. Indirect costs are sometimes sub-classified as "overhead costs" (for example, rent, utilities, and insurance); "general and administrative costs" (for example, the salary of corporate headquarters employees and costs related to that labor);

and "fringe benefit" or "payroll additive costs" (for example, employee benefits, vacation pay, and retirement plan contributions). For simplicity, this Complaint will refer to these costs collectively as "indirect costs."

26. "Indirect cost rates"—referred to herein as "overhead rates"—are percentages that express "the ratio of indirect expense incurred in a given period to direct labor cost, manufacturing cost, or another appropriate base for the same period." FAR § 2.101.

27. With cost-plus contracts, the Government relies on overhead rates reported by the contractor during contract negotiation to decide on ceiling prices and award fees, and during contract execution to calculate the amount of indirect costs payable by the Government. FAR § 42.703-1(b) (provisional Billing Rates and final overhead rates "shall be used in reimbursing indirect costs under cost-reimbursement contracts.")

28. Only "allowable" costs are chargeable to the Government. A cost is allowable if it is reasonable, allocable, and compliant with Government's Cost Accounting Standards and/or Generally Accepted Accounting Principles, the terms of the relevant Government contract(s), and limitations in Subpart 31.2 of the FAR. FAR §§ 31.201-2(a); 52.216-7.

29. A cost is allocable to a Government contract if it: (a) "is incurred specifically for the contract" (i.e., a direct cost), or (b) benefits "both the contract and other work, and can be distributed to them in reasonable proportion to the benefits received," or "is necessary to the overall operation of the business" (i.e., an indirect cost). FAR § 31.201-4.

30. Regarding direct costs, the FAR provides: "Direct costs of the contract shall be charged directly to the contract," and no "final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose in like circumstances have been included in any indirect cost pool to be allocated to that or any other final cost objective."

FAR § 31.202(a). Direct costs that are allocated to Government contracts in derogation of these rules are not allowable.

31. To recover indirect costs under Government contracts, a contractor must submit annual, certified financial statements to the United States, and claims for payment generally comprised of detailed invoices and standard form Government payment vouchers. See FAR Subpart 42.7; FAR § 52.216-7.

32. Within six months of the close of each fiscal year, a contractor must submit an Incurred Cost Submission (ICS) for its Government division(s). Each ICS includes a statement of the actual direct and indirect costs incurred by the contractor during the preceding fiscal year and a statement/proposal of the "final" overhead rate for that fiscal year based on the contractor's "actual cost experience." See id. The contractor may also periodically submit proposals to establish provisional Billing Rates that govern Government payments to the contractor until final overhead rates are established. See id.

33. The contractor must certify that all costs included in its ICS and overhead rate calculation are in accordance with the FAR's cost principles. See 10 U.S.C. § 2324(h); 41 U.S.C. § 256(h); FAR §§ 42.703-2; 52.216-7(d); 52.242-4.

34. The Government uses these submissions both prospectively and retrospectively. Prospectively, the Government relies on ICSs and overhead rate statements/proposals when negotiating forward pricing agreements known as Negotiated Indirect Cost Rate Agreements (NICRAs) by USAID and Forward Pricing Rate Agreements (FPRAs) by Department of Defense components. NICRAs and FPRAs establish provisional Billing Rates, which the contractor and the United States use: (a) to calculate interim billings and payments under cost-plus contracts, (b) to negotiate labor rates for time and materials

contracts, and (c) to negotiate overall contract prices for fixed-price contracts. See FAR §§ 15.407-3; 42.704; 52.216-7(e); 742.770.

35. Retrospectively, the Government relies on ICSs and overhead rate statements/proposals to establish final overhead rates, which the Government applies when cost-plus contracts are closed out to reconcile interim billings and payments with final billings and payments. See FAR §§ 42.705; 52.216-7(h). If a final overhead rate is higher than the Billing Rate that was applied to calculate interim contract payments, the contractor may be entitled to additional payments from the Government. Id. If a final overhead rate is lower than the Billing Rate that was applied to calculate interim contract payments, the contractor is obligated to remit overpayments to the Government. Id.

36. All government contractors are also required to "conduct themselves with the highest degree of integrity and honesty." FAR § 3.1002.

**B. The USA's Contracts with Sallyport.**

37. Sallyport has entered into numerous contracts with the United States to provide services at Balad Air Base.

38. Contract FA8615-14-C-6020 (hereinafter, the "2014 Contract") is a firm fixed price contract dated January 24, 2014. It is a foreign military sales contract, which is funded by the Air Force Life Cycle Management Center, Wright Patterson Air Force Base. The total value of the award is $1,076,483,716. The NAICS Category for the award is 561990, which is "All Other Support Services."

39. The 2014 Contract was entered to "Provide Base Operating Support Base Life Support and Security Services in support of the Iraqi F-16 Foreign Military Sales case at Balad AB,

Iraq." The Contractor (Sallyport) is required to comply with appropriate US laws, directives, and forms as listed in the PWS.

40. Since the 2014 Contract was entered into, the contract has been modified numerous times to allow for annual funding. For example, Sallyport was awarded a $200,000,000 modification (P00019) to the 2014 Contract to provide base life support, base operations support, and security for Balad Air Base, Iraq. Like the existing 2014 Contract, this modification is also made between Sallyport and the Air Force Life Cycle Management Center, Wright-Patterson Air Force Base. An additional modification awarded Sallyport a $271,813,941 modification (P00013) to exercise the option on previously awarded contract FA8615-14-C-6020 for base life support, base operations support, and security for Balad Air Base, Iraq.

41. The 2014 Contract is made up of various requirements detailed in Performance Work Statements (PWS), Performance Requirement Specifications (PRS), and Contractor Data Requirement Lists (CDRLs). Sallyport, as Contractor, must comply with all the 2014 Contract's requirements, including those described in these additional attachments.

42. Multiple PWS's provide that all work performed shall be in accordance with all applicable local, international codes and standards including but not limited to the International Civil Aviation organization (ICAO), Federal Aviation Administration (FAA), and applicable US and Iraqi military standards. In all cases, and in the event of conflicts, the more stringent criteria shall be used.

43. PRS's require that ATC equipment be maintained 100% of the time, that Sallyport provide properly certified personnel 100% of the time, and Sallyport is required to provide a detailed incident report within 24-hours of incident at least 95% of the time.

44. According to PWS Version 3.00, dated 24 January 2014, Section 3.2.10.1 provides that:

> The Contractor shall manage, operate and provide all the services and support necessary to run the Balad AB airfield for the IqAF F-16 and Cessna missions. Such services and support include running the base operations center, air traffic control, radar approach control, airfield ground support services, aerial port operations, air terminal services, cargo handling services, and air terminal information services. The Contractor shall prepare and submit a Weekly Balad AB Air Operations Report for all efforts conducted under paragraph 3.2.10. (DI-MISC-80508B, A001, b.12).

45. Additionally, the PWS' require Sallyport to provide air traffic control as well as training and mentorship to Iraqi Air Force Personnel.

> 3.2.10.2.4 Air Traffic Control (ATC) Support. The Contractor shall manage on-site and provide Air Traffic Control services for Balad AB to include but not be limited to operating Balad AB's ATC Tower, the radar approach control (RAPCON) services, aircraft ground movement control, etc. The Contractor shall provide International Civil Aviation Organization (ICAO) trained, experienced and certified Air Traffic Controllers for Balad AB. The Contractor shall perform other ATC and RAPCON services include but are not limited to: developing and maintaining terminal instrument approach requirements such as developing and managing initial and reoccurring NAVAID Certification skill sets to include air traffic controller with automation experiences requirements, evaluating construction impacts on airfield operations, and developing and maintaining additional instrument approaches to meet mission requirements. The Contractor shall also ensure personnel performing ATC and RAPCON duties include but are not limited to being proficient in creating and maintaining ATC Radar display maps/mapping.
> …
> 3.2.10.3.4 Navigational Aids (NAVAIDS) OM&R Support. The Contractor shall manage on-site, operate, mentor the IqAF, and provide OM&R services for all aircraft operations-based communications and navigation equipment located on Balad AB. NAVAIDs systems and equipment includes but is not limited to the air traffic control tower systems, integrated and federated/distributed radar systems and operations consoles, and ground-based equipment that supports aviation-based communications and navigation such as but not limited to the Instrument Landing System (ILS), Automated Weather Observation System (AWOS), Visual Omni-Range/Tactical Air Navigation (VORTAC) systems and subsystems, ASR-11 Radar, etc. The Contractor shall report Balad AB NAVAIDs availability and each system's status weekly. (DI-MISC-80508B, A001, b.7).

PWS Version 3.00, dated 24 January 2014.

46. Additionally, a PWS required the installation of a Raytheon ASR-11/Autotrack II (or equivalent) Radar system as well as construction of a RAPCON facility. While Sallyport acquired such a Radar system, it was improperly installed and was degraded. See PWS 6.2, Version 1.02, January 10, 2014.

47. On the job training is required to be provided on all Communications Network Systems and services and interim contractor support is required to maintain all equipment and systems.

48. As described below, Sallyport's Airfield Director, Todd Fairfield, masked delinquencies during QA Inspections. Brandon Le, a Sallyport auditor, issued a "fail" rating on a June 2, 2018 Scheduled Audit of Air Traffic Control (ATC) Support. Mr. Le told Sallyport that the United States should be told of this fail rating. In response, Mr. Fairfield wrote that he "strongly disagree[d]" with such fail rating.[3] **He further wrote that "the new CDRL states properly staff RAPCON and do maintenance 100% of the time. we are compliant and I disagree with the failure[.]"** Mr. Fairfield further wrote that "RAPCON has 1) properly certified personnel 100% of the time. 2) ATC Equipment maintained 100% of the time. 3) Provides a detailed incident report within 24 hrs of incident 95% of the time." Mr. Fairfield then stated that "Balad RAPCON is FMC [Fully Mission Capable]." At the time of Mr. Fairfield's email, Sallyport had not provided any RAPCON services at Balad Air Base. As described below, Sallyport undertook a scheme to downplay and misrepresent Sallyport's performance to the United States.

---

[3]After Mr. Le assigned a "fail" rating, Sallyport did not allow Mr. Le to audit these issues again.

49. 2014 Contract compliance is verified in various Performance Assessment Reports (PAR) and Quality Assurance (QA) Inspections. The PARs are conducted by the United States Air Force Personnel.

50. On January 30, 2018, Sallyport Global Holdings, was awarded a not-to-exceed $400,000,000 cost-plus-fixed-fee contract to provide continued base operations support, base life support, and security services in support of the Iraq F-16 program at Balad Air Base. The contract provides for the support of F-16-related contractor personnel at Balad Air Base, Iraq. This contract was the result of a sole-source acquisition and involves foreign military sales to Iraq. Foreign military sales funds in the amount of $196,000,000 will be obligated at the time of the award. Air Force Life Cycle Management Center, Wright-Patterson Air Force Base, Dayton, Ohio, is the contracting activity (FA8630-18-C-5003).

51. On January 30, 2019, Sallyport Global Holdings, was awarded a not-to-exceed $375,000,000 cost-plus-fixed-fee contract action to provide continued base operations support, base life support, and security services in support of the Iraq F-16 program at Balad Air Base. The contract provides for the support of F-16-related contractor personnel at Balad Air Base, Iraq. This contract was the result of a sole-source acquisition and involves foreign military sales to Iraq. Foreign military sales funds in the amount of $196,000,000 will be obligated at the time of the award. Air Force Life Cycle Management Center, Wright-Patterson Air Force Base, Dayton, Ohio, is the contracting activity (FA8630-18-C-5004).

## Defendants' Fraudulent Conduct

### A. Balad Air Base

52. Balad is an Iraqi base north of Baghdad. Despite being an Iraqi air base, it is largely funded by the United States.

53. The United States contracted with Sallyport to provide personnel to staff the Balad Air Base and currently, there are approximately 2,500-3,000 Sallyport employed personnel on the base.

54. Sallyport has contracted with various subcontractors to help perform the 2014 Contract requirements, including with IAP. Sallyport is liable for its subcontractors' performance.

55. According to Sallyport, it "manages and provides air traffic control services to include operating the base ATC tower, the radar approach control (RAPCON) services, aircraft ground movement control, etc. We provide ICAO-trained, experienced and certified air traffic controllers."[4] As described below, despite claiming to provide these services, Sallyport has failed to do so.

56. Sallyport provided a host of services at Balad Air Base and this Complaint details its failure to maintain and certify Balad's Radar system, navigational aids, and its utter failure to provide meaningful RAPCON services, which the Iraqi F-16 program depends on.

57. While Sallyport was free to choose which manufacturers to use for navigational aids, it was encouraged to use a single manufacturer. To save money, Sallyport sourced from multiple manufacturers. This led to a situation where maintenance personnel simply were not familiar with certain systems and they were incapable of maintaining the systems. See PWS, January 10, 2014, Section 2.

---

[4] https://www.sallyportglobal.com/projects/balad-air-base/ (last accessed: April 19, 2019).

**B. RAPCON Services at Balad Air Base**

58. RAPCON stands for Radar Approach Control and it is an air traffic service. In order to provide RAPCON services, a Radar system is required and without a Radar system, RAPCON services cannot be provided.

59. The Radar system is a necessary component to effectively provide RAPCON Services. The Radar system's data is fed into a different system known as the Auto Trac II System. The Auto Trac II System then produces a video feed that is visible to the RAPCON controllers, who can then interpret the results and communicate the information to aircraft.

60. Balad ATC Tower and RAPCON are separate facilities, although they are located in the same building. The RAPCON radar room is located at the base of the ATC Tower.

61. Balad ATC Tower does not rely on RAPCON to function and the Balad ATC Tower provides a separate and distinct visual air traffic control service than does RAPCON. Whereas the ATC tower visually sees aircraft, RAPCON controllers do not have visual sight on aircraft and therefore, the controllers rely on the navigational instruments in front of them. When the navigational aids do not work, which was the case at Balad Air Base, RAPCON controllers are unable to perform their job duties.

62. RAPCON services are provided by RAPCON controllers and the Radar system, which is a necessary component for the RAPCON controllers, is supposed to be maintained by Sallyport and IAP technicians.

63. Relators and their colleagues quickly determined that rather than providing trained maintenance technicians capable of maintaining navigational systems, Sallyport employed untrained maintenance personnel who did not have the skill or training to maintain

sophisticated navigational aids. These untrained and uncertified technicians were unable to maintain navigational equipment, including Radar, Auto Trac II, TACAN, VOR, Instrument Landing Systems, radios, and other navigational aids. Sallyport's failure to maintain these systems is in direct violation of the 2014 Contract and has created dangerous situations in and around Balad Air Base. Sallyport is required to provide all of these navigational aids under the terms of the 2014 Contract.

64. While the RACPON controllers were certified and trained, the technicians used to maintain the facility were not. Sallyport allowed untrained technicians to work and maintain the systems.

65. While Sallyport failed to employ qualified maintenance personnel, it received government money under the 2014 Contract to provide qualified personnel. Rather than not requesting the money from the government or returning the money to the government, Sallyport kept the funds and fraudulently inflated their costs. Sallyport began a process by barcoding and tagging and all property and passed such costs on to the Government.

66. Even if Sallyport provided properly trained maintenance personnel, which it did not, it failed to also provide the technicians with calibration equipment. Calibration equipment is necessary to certify the navigational aid systems. Navigational aids used in air traffic must be calibrated to ensure accuracy and non-calibrated equipment is worthless to RAPCON controllers.

67. Balad's RAPCON and Radar system was installed by Raytheon. Raytheon worked in collaboration with Sallyport Construction Services to install a Raytheon ASR-10SS Radar. Sallyport accepted Raytheon's ASR-10SS Radar System on or about February 6, 2017, after Raytheon performed a Systems Acceptance Test. Raytheon submitted a letter and

report to Sallyport Global Services on or about February 3, 2017 indicating that Raytheon deemed the Radar system to be satisfactory. This Radar System works in tandem with Raytheon's AutoTrac II, which is a flight and surveillance data processing systems that uses a series of measurements observed over time to display information to controllers in a logical and easy-to-read manner. Sallyport accepted this system on or about February 15, 2017.

68. Sallyport's lead technician, Jeff Broman, believed that at this time, the system was not ready and operable. Despite Mr. Broman's concerns, Sallyport accepted the Radar system.

69. After Sallyport accepted the system from Raytheon in February 2017, it showed little initiative to make the RAPCON function and it had little incentive to do so.

70. Immediately after Sallyport accepted the Radar system, the Radar system began to degrade. The Radar system degraded because Sallyport did not have properly trained technicians to perform preventive and corrective maintenance such as daily checks, weekly checks, monthly checks, and annual checks to certify and calibrate the Radar system.

**C. Sallyport Began Staffing RAPCON Controllers in June 2016, Yet Sallyport Did Not Provide RAPCON Services Until October 2018**

71. Beginning in June 2016, Sallyport began staffing RAPCON controllers. At this time, the RAPCON was not operational and the Radar system was not accepted until February 2017. Unbeknownst to the Government, RAPCON services could not have been provided before February 2017 due to the lack of a Radar system.

72. From the June 2016 initial RAPCON controller staffing through the following nine months, Balad Air Base did not have an operational Radar system. Because of this, under no circumstances could RAPCON services have been from June 2016 through February 2017.

73. From June 2016 through the end of April 2017, RAPCON controllers were physically stationed and located in the passenger terminal of the air base, one mile from the facility. At this time, the RAPCON controllers had no assigned duties because the RAPCON system was inoperable.

74. The 2014 Contract required that Sallyport build a RAPCON facility. Upon information and belief, Sallyport did not complete the RAPCON facility until May 2017. In or about May 2017, RAPCON controllers were moved from the passenger terminal into the radar facility.

75. In order to provide RAPCON services, controllers must see aircraft on a radar display and communicate via radio. Prior to moving into this facility in May 2017, Sallyport's RAPCON controllers were not in a radar and radio-equipped facility, which necessarily implies RAPCON services were not provided.

76. On June 28, 2017, Sallyport's Quality Manager Richard Price sent an Air Operations Group Evaluation Report concerning ATC, NAVAID, and Air Traffic Control and Landing Systems (ATCALS) compliance and recommended actions, to United States Government Contracting Officer Representative, Randy Evey. Mr. Evey was stationed at Balad Air Base although he reported to Wright-Patterson AFB in this District. Although the report identifies equipment concerns, it fails to mention that RAPCON services are not being used and that the Radar system is inoperable.

77. In December 2017, Relator Bullock was named RAPCON Chief.

78. In the last few months of 2017, Sallyport increased the number of RAPCON positions for the upcoming year 2018. Upon information and belief, Sallyport increased the number of RAPCON controllers in 2018 because it had a cost-plus contract from the USA and Sallyport profited from additional controllers. The cost-plus contract, as referenced above,

is contract number FA8630-18-C-5003. Todd Fairfield, Sallyport's Air Field Director, stated that because this was a cost-plus contract, Sallyport should hire as many people as possible because Sallyport profited from each position.

79. Sallyport created several positions around this time, including a Terminal Instruments Procedures (TERPS) supervisor position. The position was slated for a $170,000 annual salary. This position is used to design instrument approaches, chart obstacle clearance, etc. Jeppesen, a subcontractor, had already been contracted to perform this task. According to Danielle Esposito, Sallyport canceled this position in April 2019 on the basis that the PWS never required the position.

80. Sallyport steadily increased the number of RAPCON controllers from June 2016 through September 2018 even though there was nothing for the controllers to do during this time period. For example, in June 2016, there were three controllers. In November 2016, Sallyport staffed six RAPCON controllers. In June 2017, Sallyport staffed eleven RAPCON controllers and continued to do so until May 2018 when it began staffing twelve RAPCON controllers. Despite these positions being staffed, none of these positions were necessary and the RAPCON controllers did not provide any RAPCON services prior to October 2018.

81. As evidence that the controllers were unneeded prior to October 1, 2018, Sallyport's air traffic logs demonstrate that no RAPCON activity occurred prior to October 1, 2018. Yet, throughout the 22 months leading up to October 1, 2018, Sallyport continually increased the number of RAPCON controllers it staffed. Upon information and belief, Sallyport staffed controllers to invoice the government and profit from these positions.

82. Sallyport Air Traffic Control Weekly Reports demonstrate that on September 29 and September 30, 2018, no RAPCON Operations occurred. On October 1, 2018, 17 RAPCON Operations occurred. These were the first RAPCON services provided by Sallyport at Balad Air Base.

83. October 2018 RAPCON traffic logs demonstrate that RAPCON controllers had 544 interactions with pilots during October 2018.

84. During the preceding 22 months, RAPCON controllers showed up for their shifts and then within a few minutes, went back to their housing. Despite the controllers not working, payroll records indicate that the controllers worked approximately 60 hours per week.

85. In addition to not having capable Radar before this time, Sallyport did not even have assigned radio frequencies for the controllers until shortly before October 2018. Without radio, controllers would have been unable to communicate with airplanes.

86. Shortly after starting to provide RAPCON services, controllers determined that the Radar system was not functioning properly.

87. Relator Bullock stopped the provision of RAPCON services in November 2018 after determining that Radar was showing "false targets." False targets are such that RAPCON controllers were receiving returns (viewing objects on Radar), yet the controllers could not verify what they were seeing. These returns could be anything from an aircraft, a bird, a glider or simply an anomaly and nothing was present. Because Radar was showing these targets, controllers were unable to determine what they were seeing and therefore, they could not provide RAPCON services.

88. Sallyport was unhappy with Relator Bullock's decision to stop providing RAPCON services and instructed him to continue providing RAPCON services. Relator refused.

89. Sallyport's November 2018 ATC Monthly Report, signed by Randall Borrell, the ATC Manager, demonstrates that in November 2018, no RAPCON services were provided. The December 2018 report indicates that the RAPCON was "up and operational."

90. Upon information and belief, Sallyport did not tell the Government that RAPCON services were not being provided or the services that were provided were of no value due to Radar and navigational aid failure.

91. After Sallyport resumed providing RAPCON services, Relator Bullock again determined that the Radar system was not functioning properly. Since the Radar system was not functioning properly, RAPCON services could not be provided. Over Relator's recommendation, Sallyport refused to stop providing RAPCON services at this time despite knowing the services had no value and it failed to tell the Government about this issue.

92. In March 2019, Relator Patrick wrote an email to Sallyport's maintenance supervisor, James Becerra, indicating that the navigational aid equipment was not certified and was therefore not safe to use.

93. Mr. Becerra revised Relator Patrick's concerns and indicated that all systems were fully operational. Mr. Becerra wrote a report to Sallyport's Director of Air Operations, Todd Fairfield, indicating the equipment was operational but qualified such position by indicating "maintenance cannot verify any of the system parameters . . . because currently there are no calibrated pieces of test equipment available on site. I currently cannot verify if any of the system parameters recorded during the flight check have drifted out of tolerance requiring me to adjust them back into their normal operating range. Therefore using the above equipment end items are at user's discretion. End user will have to accept

responsibility for anything that happens if equipment is used for Air Traffic Control purposes."

94. Mr. Fairfield responded by writing that "IAP is not saying the systems are not working and reliable. They are saying they do not have the capability to validate that the systems are still operating within parameters set which passed Flight Test. They cannot complete checks due to the test equipment having expired calibrations." Following this, Sallyport's Air Operations Group submitted an Air Traffic Control & Landing Systems (ATCALS) Status Report indicating that 84% of systems were operational, 16% were degraded, and 0% were inoperative. Yet during this time period, the Radar system was turned off. In various PWS', Sallyport was required to report weekly status of all navigational systems. Upon information and belief, Sallyport did not inform the Government that Radar was turned off.

95. Sallyport also turned off other navigational equipment when it simply did not work and never told the Government about this. For example, the ILS to Balad Air Base's Runway 32 repeatedly went into alarm. The technicians fix was to disable or bypass the monitor so that the system would not go into alarm any longer. During this time, the glide scope was out of service.

96. In discussions with Relator Bullock, Mr. Fairfield indicated that although the Radar and RAPCON systems would not be operable or allowable in the United States or Europe, they were allowable in Iraq.

**D. Sallyport Misled the USA into Believing that the RAPCON and Navigational Aids Were Operational When in Fact, They Were Inoperable Due to Non-Calibration**

97. Despite knowing that RAPCON services were not provided prior to October 1, 2018, Sallyport misrepresented the services it was providing to the United States.

98. Sallyport did not have an effective and operational Radar system and hid this fact from the Government. Sallyport never told the Government that the Radar was not operational and that its technicians were incapable of maintaining the system. Rather, it downplayed the severity of the ineffectiveness by indicating the Radar system was only slightly "degraded." In reality, the Radar system was oftentimes simply turned off and was not in operation.

99. The 2014 Contract and PWS's require that Sallyport provide weekly Contractor Data Requirement Lists (CDRL) to the Government. In these weekly CDRLs, which are a deliverable under the 2014 Contract as well as all other Sallyport and USA Contracts performed at Balad Air Base, Sallyport routinely indicated the Radar was operational or slightly degraded. Nowhere in the CDRLs does Sallyport alert the Government that the Radar was turned off from October 2017 through March 2018. Because the Radar was off, RAPCON services could not have been provided.

100. Sallyport's Anthony Rocco and Richard Price told a U.S. government COR, Randy Evey, that Sallyport had equipment concerns. In reality, these equipment concerns actually meant that systems were not being used and had been simply turned off.

**E. When the RAPCON Opened, it was Ineffective due to Ineffective and Non-Calibrated Radar Equipment**

101. Balad Air Base's Radar system was ineffective from the moment Sallyport accepted the system in February 2017 and it remains ineffective to this day.

102. Sallyport's maintenance technicians fail to perform any meaningful maintenance checks with calibrated equipment. Sallyport incurs significant cost in getting the calibration equipment shipped to the United States for calibration and then returned to Iraq each year. Rather than incur these costs, Sallyport has opted to not provide calibrated equipment.

103.     Pilots and air traffic controllers depend on calibrated and properly maintained navigational aids for operating in Instrument Flight Rule weather. This is what allows the pilot to safely fly an approach into any airport when the weather is poor. When Sallyport failed to ensure that the navigational systems were properly calibrated, any RAPCON services that may have been provided were worthless.

104.     Despite the Contract requiring that Sallyport provide RAPCON services, and with full knowledge that the RAPCON was not operational, Sallyport submitted invoices to the United States of America for payment as if the services were provided.

## F. Other Allegations of Wrongdoing

### 1. Foreign Corrupt Practices Act

105.     Upon information and belief, Sallyport paid bribes to Iraqi government officials in violation of the Foreign Corrupt Practices Act of 1977 ("FCPA"), 15 U.S.C. §§ 78dd-1, *et seq.*

106.     The FCPA was enacted for the purpose of making it unlawful for certain classes of persons and entities to make payments to foreign government officials to assist in obtaining or retaining business. Specifically, the anti-bribery provisions of the FCPA prohibit the willful use of the mails or any means of instrumentality of interstate commerce corruptly in furtherance of any offer, payment, promise to pay, or authorization of the payment of money or anything of value to any person, while knowing that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to a foreign official to influence the foreign official in his or her official capacity, induce the foreign official to do or omit to do an act in violation of his or her lawful duty, or to secure

any improper advantage in order to assist in obtaining or retaining business for or with, or directing business to, any person.

107.    Since 1977, the anti-bribery provisions of the FCPA have applied to all U.S. persons and certain foreign issuers of securities. With the enactment of certain amendments in 1998, the anti-bribery provisions of the FCPA now also apply to foreign firms and persons who cause, directly or through agents, an act in furtherance of such a corrupt payment to take place within the territory of the United States.

108.    The FCPA also requires companies whose securities are listed in the United States to meet its accounting provisions. *See* 15 U.S.C. § 78m. These accounting provisions, which were designed to operate in tandem with the anti-bribery provisions of the FCPA, require corporations covered by the provisions to (a) make and keep books and records that accurately and fairly reflect the transactions of the corporation and (b) devise and maintain an adequate system of internal accounting controls.

109.    According to a Sallyport employee and in violation of the FCPA, the company repeatedly paid bribes to General Sahi and Iraqi customs officers, Iraqi government employees. General Sahi was the commander of Iraqi forces at Balad. The bribes were paid to facilitate Sallyport's operations in Iraq and to expedite entry into the country by Sallyport workers awaiting visas.

110.    Upon information and belief, Sallyport in violation of the books and records provisions of the FCPA, hid the bribes on its books and called them "penalties."

111.    On or about November 2018, Sallyport's parent company, Caliburn International Corporation, filed an S-1 form with the U.S. Securities and Exchange Commission. The company disclosed: "*As part of our business, we may deal with foreign governments or*

*state-owned business enterprises, the employees and representatives of which may be considered foreign officials for purposes of the FCPA. In addition, we operate in Iraq, Afghanistan and other international locations that have less developed legal systems and/or have elevated levels of corruption as compared to the United States. In such locations, certain U.S. or global companies have been the subject of intense scrutiny, criticism and negative publicity by investors, financial commentators and regulatory agencies. We maintain, and are in the process of updating, policies and procedures designed to assist us and our respective employees all over the world in complying with our code of conduct and applicable laws and regulations.* ***Such policies are not yet uniform across our organization. However, we cannot assure you that our policies and procedures have been or will be effective to prevent us, our subsidiaries or our respective employees and agents from violating any laws and regulations.***" [emphasis added].

112.    In November 2016, Sallyport disclosed to the U.S. Department of Justice a potential violation of the FCPA and potentially other U.S. laws related to Afaq Umm Qasr Marine Services Company ("Afaq"), Sallyport's partner on several USAF contracts at several bases in Iraq, including the Balad Air Base.

### 2. Audit Fraud

113.    Upon information and belief, Sallyport misled U.S. government auditors who were looking into a large shortfall of inventory owned by or paid for with U.S. government funds. Rather than admit to a shortfall and missing inventory, Sallyport misled auditors by placing inventory tags on employee's personally owned property making it appear that no shortfall occurred.

114.     Upon information and belief, Sallyport misappropriated money earmarked for ATC and navigational aid maintenance. In lieu of maintaining equipment and providing training, together with qualified maintenance technicians, Sallyport claimed the money was used on other Sallyport property to inflate their costs.

## Count I– Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

115.     Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

116.     Relators seek relief against Defendants under Section 3729(a)(1)(A) of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

117.     As set forth above, Defendants knowingly or acting with deliberate ignorance or with reckless disregard for the truth, presented, or caused to be presented, to an officer, employee or agent of the government, false and fraudulent claims for payment or approval in connection with invoices relating to Defendants' work under the Contract. Such invoices were inflated or were not supportable by Defendants' own business records and therefore, are false and/or fraudulent.

118.     The United States paid Defendants the funds purportedly called for in the invoices because of Defendants fraudulent conduct.

119.     By reason of Defendant's false claims, the United States has been damaged in a substantial amount to be determined at trial, and a civil penalty as required by law for each violation.

## Count II– Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

120.     Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

121.    In performing the acts described above, Defendants, individually by and through their own acts, or through the acts of their agents, servants, officers and employees, knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States in violation of 31 U.S.C. § 3729(a)(1)(B).

122.    As set forth above, Defendants knowingly or acting in deliberate ignorance or in reckless disregard of the truth, made, used, and caused to be made and used, false records and statements material to a false or fraudulent claim in connection with the receipt of the United States' funds.

123.    Because of Defendants' conduct, the United States has been damaged, and continues to be damaged, in an amount to be determined at trial, and a civil penalty as required by law for each violation.

### Count III– Violations of the Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

124.    Relators restate and incorporate each and every allegation above as if the same were fully set forth herein.

125.    In performing the acts described above, Defendants, individually by and through their own acts, or through the acts of their agents, servants, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the United States, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the United States in violation of 31 U.S.C. § 3729(a)(l)(G).

126.    Defendants were paid money by the United States that they knew they were not entitled to receive. Despite having knowledge that they were overpaid by the United States, Defendants have retained all the overpayments.

127.    Defendants have an obligation to return such overpayments to the United States, and such failure to return the overpayments is a violation of 31 U.S.C. § 3729(a)(l)(G).

128.    Defendants' failure to refund the known overpayments caused by their false claims constitutes a separate, continuing violation of the False Claims Act.

WHEREFORE, Relators, on behalf of the United States, respectfully pray that judgment be entered in their favor against Defendants as follows:

A. An order enjoining Defendants from further violations of the False Claims Act, 31 U.S.C. § 3729, *et seq*.

B. Treble the amount of damages sustained by the United States Government because of Defendants' actions, and civil penalties and the costs of this action, with interest, including the costs to the United States, Relators, and Relators' counsel for their expenses related to this action;

C. All expenses and attorneys' fees incurred by Relators in this action, as provided by law; and

D. Any other equitable relief this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, a jury trial is demanded.

Dated: June 12, 2019.

Warner Mendenhall, 0070165
The Law Offices of Warner Mendenhall
190 N. Union St., Suite 201
Akron, OH 44304
(330) 535-9160; fax (330) 762-9743
warner@warnermendenhall.com


Brian H. Mahany (WI Bar: 1065623)
Mahany Law
*Pro Hac Vice* to be filed contemporaneously
P.O. Box 511328
Milwaukee WI 53203
T: (414) 258-2375
F: (414) 777-0776
brian@mahanylaw.com


ATTORNEYS FOR PLAINTIFF-RELATOR